**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 29, 2022**

# In the Court of Appeals of Georgia

A22A0534. KELLEY et al. v. THE CINCINNATI INS. CO.

HODGES, Judge.

Considering this action arising from a motorized watercraft collision, Susan and Randy Kelley sued their underinsured/uninsured motorist ("UM") and underinsured/uninsured watercraft ("UW") insurance carrier, The Cincinnati Insurance Company, after Mr. Kelley sustained serious injuries when a boat in which he was a passenger was struck by another boat. The Kelleys argued that Cincinnati owed UM and UW benefits to them pursuant to Georgia's UM statute, OCGA § 33-7-11. The parties filed competing motions for summary judgment and, following a hearing, the Superior Court of Floyd County granted Cincinnati's motion and denied the Kelleys' motion. The Kelleys appeal, arguing that the trial court erred in concluding that OCGA § 33-7-11 UM benefits are not available for damages arising

from a collision between two motorized watercraft on a public waterway. After careful review of the provisions of OCGA § 33-7-11 and application of Georgia's rules of statutory construction, we are constrained to affirm.

"We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. Because this opinion addresses cross-motions for summary judgment, we will construe the facts in favor of the nonmoving party as appropriate." (Citation and punctuation omitted.) *Crown Series, LLC v. Holiday Hospitality Franchising, LLC*, 357 Ga. App. 523 (851 SE2d 150) (2020). So viewed, the underlying facts are largely undisputed.

(a) *The Collision*. On June 4, 2019, Mr. Kelley was a passenger in a boat owned by his friend, Larry "Chip" Wheat, as the pair traveled the Coosa River[1] in Floyd County. As they rounded a bend in the river, a boat traveling in the opposite direction and operated by Melvin Ellison collided with Wheat's boat. Ellison's boat struck Mr. Kelley, throwing him to the deck of Wheat's boat and inflicting a variety of serious injuries, including a brain injury, a ruptured diaphragm, a ruptured spleen,

---

[1] Formed by the confluence of the Etowah and Oostanaula Rivers, the Coosa River flows east to west through Rome, Georgia before entering Alabama, where it eventually flows into the Gulf of Mexico, much like the Kuhbach flows into the Danube and on to the Black Sea.

a left lung puncture, broken left scapula, numerous broken ribs, and other injuries reportedly resulting in over $500,000 in medical expenses. The Georgia Department of Natural Resources cited Ellison for violating federal and state boating regulations.

(b) *The Kelleys' Insurance Coverage*. On the date of the collision, the Kelleys had three insurance policies in effect from Cincinnati:

1. a homeowners policy;[2]

2. an automobile policy (the "Auto policy"), which provided the following limits: (i) $500,000 for bodily injury for each person and each accident; (2) $100,000 for property damage for each accident; (3) $500,000 in UM coverage for each person and each accident; and (4) $100,000 in UM property coverage; and

3. a personal watercraft policy (the "Watercraft policy"), with a liability limit of $500,000, a medical payment limit of $5,000, and an uninsured watercraft limit of $500,000.

On the date of the collision, Ellison had a watercraft policy in effect with State Farm Fire and Casualty Company with a liability limit of $100,000 and a medical

---

[2] There is no dispute that the Kelleys' homeowners policy is not implicated in this case.

payment limit of $1,000. State Farm exhausted its policy limits, paying $90,000 to Mr. Kelley and $10,000 to Wheat.

(c) *The Kelleys' Claim and Subsequent Proceedings*. Once State Farm exhausted its policy limit, the Kelleys sent a demand to Cincinnati seeking UM and UW benefits under their Auto and Watercraft policies, respectively. Referring to the express terms of the policies, Cincinnati denied coverage.[3] The Kelleys filed their

---

[3] The trial court succinctly explained the reasons for Cincinnati's denial of coverage, a finding which the Kelleys do not contest in this appeal, see n. 4, infra:

> The Parties agree that the plain language of [the Auto and Watercraft] policies do not provide for recovery by the Kelleys. By its plain terms, the UM coverage in the Auto Policy provided that [Cincinnati] would "pay compensatory damages to which a 'covered person' is legally entitled to recover from the owner or operator of an 'uninsured motor vehicle'..." The Auto Policy further specifies that "'motor vehicle' does not include . . . watercraft . . . ." The Personal Watercraft Policy only applied to accidents in which the insured is legally entitled to recover from the operator of . . . an "uninsured watercraft" because of bodily injury . . ., defining "uninsured watercraft" as "a vessel of any type . . . *to which no bodily injury policy applies at the time of the accident*." By definition, neither policy would permit recovery by the Kelleys from [Cincinnati].

(Emphasis supplied.) The trial court's order tracked the definition of "[u]ninsured

4

complaint against Ellison for negligence, negligence per se, loss of capacity to earn, loss of consortium, and attorney fees and expenses, and served Cincinnati with the complaint pursuant to OCGA § 33-7-11. Cincinnati moved for summary judgment, arguing, in part, that OCGA § 33-7-11 is inapplicable to uninsured watercraft claims. The Kelleys responded with a motion for partial summary judgment asserting that OCGA § 33-7-11, which must be construed broadly to effectuate its remedial purpose, should be construed to include motorized watercraft within the definition of "motor vehicle."

The trial court initially found that "[t]he Kelleys do not contest that the plain language of the UM and UW policies preclude recovery" and that "[t]he Parties agree that the plain language of [the Auto and Watercraft] policies do not provide for

---

watercraft" from the Uninsured Watercraft Coverage endorsement to the Watercraft policy, which states that an "'[u]ninsured watercraft' means a 'vessel' of any type . . . [t]o which no 'bodily injury' liability policy applies at the time of the 'accident'[.]" Compare OCGA § 33-7-11 (b) (1) (D) (i) ("'Uninsured motor vehicle' means a motor vehicle . . . as to which there is . . . [n]o bodily injury liability insurance and propoerty damage liability insurance[.]"). While OCGA § 33-7-11 (b) (1) (D) (ii) contains an underinsurance provision, see *Allstate Fire & Cas. Ins. Co. v. Rothman*, 332 Ga. App. 670, 671, n. 1 (774 SE2d 735) (2015), the Watercraft policy does not include a corresponding provision.

recovery by the Kelleys."[4] The trial court then concluded that OCGA § 33-7-11 "does not apply to personal watercraft," granted Cincinnati's motion, and denied the Kelleys' competing motion. This appeal follows.

1. In a single enumeration of error, the Kelleys contend that the trial court erred in granting Cincinnati's summary judgment motion because the boat that struck Mr. Kelley was an "uninsured motor vehicle" as that term is defined under OCGA § 33-7-11 and, as a result, the UM and UW provisions in the Kelleys' Auto and Watercraft policies may each be enforced to provide UM and UW benefits up to their respective limits. In reaching their conclusion, the Kelleys assert that the term "uninsured motor vehicle" includes motorized watercraft, that both the Kelleys' Auto and Watercraft policies are "motor vehicle liability policies," that Cincinnati's purported attempt to limit coverage in the policies is contrary to Georgia's insurance statutes, and that Cincinnati's overly narrow definition of "motor vehicle" contravenes Georgia public policy.

---

[4] The Kelleys do not challenge these findings and, as a result, the question of whether UM coverage is available based upon the plain language of the Auto and Watercraft policies is not before us; therefore, if coverage is available at all, it is only available by operation of OCGA § 33-7-11. Nor do we express any opinion concerning any other of the Kelleys' potential causes of action.

6

(a) *Rules of Construction Generally*. Of course, this case requires that we construe Georgia's UM statute, OCGA § 33-7-11.

> When we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant. Thus if the language of the statute is plain and unambiguous, we simply apply the statute as written. Additionally, we must construe statutes to give sensible and intelligent effect to all of their provisions and to refrain from any interpretation which renders any part of the statutes meaningless.

(Citations and punctuation omitted.) *DeKalb County Bd. of Tax Assessors v. Astor Atl, LLC*, 349 Ga. App. 867, 869 (826 SE2d 865) (2019). To that end,

> we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage.

(Citations and punctuation omitted.) *DeKalb County Bd. of Tax Assessors v. Barrett*, 361 Ga. App. 598, 600-601 (865 SE2d 192) (2021). Moreover, "it is an elementary rule of statutory construction that statutes relating to the same subject matter are in pari materia and must be construed together and harmonized whenever possible." (Citation and punctuation omitted.) *Long v. Dev. Auth. of Fulton County*, 352 Ga.

App. 815, 821 (3) (b) (835 SE2d 717) (2019); see also *Mornay v. Natl. Union Fire Ins. Co. of Pittsburgh, PA.*, 331 Ga. App. 112, 115 (3) (769 SE2d 807) (2015) ("[C]ourts may look to other provisions of the same statute to determine the meaning of a particular statutory provision. Context is a primary determinant of meaning.") (citation and punctuation omitted).

(b) *Georgia's UM Statute*. With particular regard to OCGA § 33-7-11, we first note that "an insurer may fix the terms of its policy as it wishes, provided the terms are not contrary to law." *Mabry v. State Farm Mut. Auto. Ins. Co.*, 334 Ga. App. 785, 788 (1) (780 SE2d 533) (2015). Accordingly,

> [w]e bear in mind that the purpose of uninsured motorist or UM coverage is to place the injured insured in the same position as if the offending uninsured motorist were covered with liability insurance. [Therefore,] [t]he Georgia uninsured motorist statute is designed to protect the insured as to his actual loss, within the limits of the policy or policies of which he is a beneficiary.

(Citation and punctuation omitted.) Id. Furthermore,

> uninsured motorist statutes are remedial in nature and must be broadly construed to accomplish the legislative purpose. That legislative purpose is to require some provision for first-party insurance coverage to facilitate indemnification for injuries to a person who is legally entitled to recover damages from an uninsured motorist.

(Citation and punctuation omitted.) Id.

Turning to the relevant text, OCGA § 33-7-11 (a) (1) provides:

No *automobile liability policy* or *motor vehicle liability policy* shall be issued or delivered in this state to the owner of such *vehicle*[5] or shall be issued or delivered by any insurer licensed in this state upon any motor vehicle then principally garaged or principally used in this state unless it contains an endorsement or provisions undertaking to pay the insured damages for bodily injury, loss of consortium or death of an insured, or for injury to or destruction of property of an insured under the named insured's policy sustained from the owner or operator of an *uninsured motor vehicle*, within limits exclusive of interests and costs.

(Emphasis supplied.) Of note, the statute provides that "'[u]ninsured motor vehicle' means a motor vehicle, other than a motor vehicle owned by or furnished for the regular use of the named insured, the spouse of the named insured, and, while residents of the same household, the relative of either," as to which, generally, there is:

(i) an absence of bodily injury liability insurance and property damage liability insurance;

---

[5] None of these terms — "automobile liability policy," "motor vehicle liability policy," or "vehicle" — are defined in Chapter 7 of Title 33. See, e.g., OCGA § 33-7-11 (b).

9

(ii) underinsurance;[6] see generally *Allstate Fire & Cas. Ins. Co. v. Rothman*, 332 Ga. App. 670, 671, n. 1 (774 SE2d 735) (2015) ("Under Georgia law, an 'uninsured motor vehicle' is defined to include an underinsured vehicle, i.e., an insured vehicle whose insurance coverage is insufficient to compensate fully an individual injured in an accident involving that vehicle.");

(iii) legal denial of coverage by the insurance company writing the insurance policy;

(iv) inability of the insurance company writing the insurance policy "to make either full or partial payment" due to the company's insolvency; or

(v) the lack of a bond, or deposit of cash or securities, in lieu of bodily injury and property damage liability insurance.

OCGA § 33-7-11 (b) (1) (D).

(c) *Analysis*. The Kelleys' primary argument is that motorized watercraft are included within the definition of "uninsured motor vehicle" in OCGA § 33-7-11 and

---

[6] Furthermore, there does not appear to be any dispute in this appeal that the Kelleys did not reject the UM and UW coverage limits available under the Auto and Watercraft policies. See OCGA § 33-7-11 (a) (3), (b) (1) (D) (ii) (II) & (III).

10

that, as a result, their UM and UW policies provide benefits up to their respective limits. We do not agree.

As a threshold matter, we note that "uninsured motor vehicle" is not a defined term. See OCGA § 33-7-11 (b). Therefore, we look to other sources for support.

(i) *Dictionaries*. At the outset, and as we have noted, "we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would[.]" *Barrett*, 361 Ga. App. at 600; see also *Mornay*, 331 Ga. App. at 115 (3) (where term not defined in a statute, this Court looked "to its plain and ordinary meaning as defined by dictionaries"); *Clement v. State*, 309 Ga. App. 376, 379 (1) (a), n. 1 (710 SE2d 590) (2011) ("Dictionaries may supply the plain and ordinary meaning of a word.") (citation and punctuation omitted). Accordingly, we first look to dictionary definitions.

"Motor vehicle" is defined as "a road vehicle powered by an internal combustion engine," The New Shorter Oxford English Dictionary Thumb Index Edition, 1839 (1993); "a self-propelled wheeled conveyance, such as a car or truck, that does not run on rails," The American Heritage Dictionary of the English Language, 1179 (3d ed. 1992); and "an automotive vehicle not operated on rails; esp.:

11

one with rubber tires for use on highways." Webster's Third New International Dictionary, 1476 (1981). More recent online entries contain similar definitions of "motor vehicle," including "an automobile, truck, bus, or similar motor-driven conveyance," www.dictionary.com/browse/motor-vehicle (last visited May 11, 2022); and "an automotive vehicle not operated on rails especially: one with rubber tires for use on highways[,]" www.merriam-webster.com/dictionary/motor%20vehicle (last visited May 11, 2022); compare Black's Law Dictionary 1551 (7th ed. 1999) ("vehicle" defined as "[s]omething used as an instrument of conveyance; any conveyance used in transporting passengers or merchandise by land, water, or air").[7] Accordingly, with a single exception, dictionaries consistently define "motor vehicle" as a vehicle used on land.[8]

---

[7] Inasmuch as this definition of "vehicle" is contained in a legal dictionary, as opposed to a general dictionary of the English language, it does not necessarily cohere with our duty to "read the text in its most natural and reasonable way, as an ordinary speaker of the English language would[.]" (Citation omitted.) *Barrett*, 361 Ga. App. at 600. Moreover, Black's Law Dictionary does not contain a specific definition for "motor" or "motor vehicle."

[8] Although not necessary to our decision, we note that the original legislation enacting the predecessor to OCGA § 33-7-11 specifically referenced "automobile liability insurance polic[ies]. . . ." See Ga. L. 1963, p. 588 ("An Act to amend Code Chapter 56-4, relating to the various kinds of insurance, limits of risk, and reinsurance, so as to provide that no *automobile* liability insurance policy shall be issued unless coverage is provided therein for the protection of the insured against

(ii) *In Pari Materia*. Moreover, there is no indication from other provisions in Chapter 7 that the General Assembly intended to include motorized watercraft within the definition of "motor vehicle" in OCGA § 33-7-11. See *Long*, 352 Ga. App. at 821 (3) (b) (3) ("statutes relating to the same subject matter are in pari materia and must be construed together and harmonized whenever possible") (citation omitted); *Mornay*, 331 Ga. App. at 115 (3) ("Context is a primary determinant of meaning.") (citation and punctuation omitted). Importantly, the Code provides that "[i]t is intended that certain coverages may come within the definitions of two or more kinds of insurance as set forth in this chapter, and the fact that the coverage is included within one definition shall not exclude the coverage as to any other kind of insurance within the definition of which the coverage likewise reasonably is includable." OCGA § 33-7-1. Broadly, then,

---

loss caused by an uninsured vehicle; to provide the procedure connected therewith; to repeal conflicting laws; and for other purposes.") (emphasis supplied).

[c]asualty insurance includes vehicle insurance as defined in Code Section 33-7-9[9] and accident and sickness insurance as defined in Code Section 33-7-2 and in addition includes:

(1) Liability insurance, which is insurance against legal liability for the death, injury, or disability of any human being, or for damage to property, and which provides medical, hospital, surgical, and disability benefits to injured persons and funeral and death benefits to dependents, beneficiaries, or personal representatives of persons killed, irrespective of legal liability of the insured, when issued as an incidental coverage with or supplemental to liability insurance[.]

OCGA § 33-7-3.

_____

[9] "Vehicle insurance is insurance against loss of or damage to any land vehicle or aircraft, any draft or riding animal, or to property while contained therein or thereon or being loaded or unloaded therein or therefrom from any hazard or cause, and against any loss, liability, or expense resulting from or incident to ownership, maintenance, or use of any such vehicle, aircraft, or animal, together with insurance against accidental death or accidental injury to individuals, including the named insured, while in, entering, alighting from, adjusting, repairing, cranking, or caused by being struck by a vehicle, aircraft, or draft or riding animal, if such insurance is issued as a part of insurance on the vehicle, aircraft, or draft or riding animal; and provisions of medical, hospital, surgical, and disability benefits to injured persons, funeral and death benefits to dependents, beneficiaries or personal representatives of persons killed, irrespective of legal liability of the insured, when issued as an incidental coverage with or supplemental to liability insurance." OCGA § 33-7-9. In this context, "draft" is defined as "[a] team of animals used to pull loads[,]" such as a team pulling a Barouche. The American Heritage Dictionary of the English Language, 559 (3d ed. 1992).

Against this backdrop, we note that Chapter 7 itself generally distinguishes between land vehicles and motorized watercraft. For example, the definition of "vehicle insurance" in Chapter 7 addresses insurance against losses to "land vehicles," "aircraft," and "draft or riding animal[s]." See OCGA § 33-7-9. Moreover, the additional, broad category of "casualty insurance" encompasses "automobile insurance" and "motor vehicle insurance." These provisions standing alone do nothing to assist in the construction of OCGA § 33-7-11 and its potential applicability to motorized watercraft, since OCGA § 33-7-11 plainly applies to "automobile liability" policies or "motor vehicle liability" policies. However, Chapter 7 also includes a definition of "marine protection and indemnity insurance." See OCGA § 33-7-5 (7) ("Marine protection and indemnity insurance, which is insurance against. . . loss, damage, or expense arising out of, or incident to, the ownership, operation, chartering, maintenance, use, repair, or construction of any vessel, craft, or instrumentality in use in ocean or inland waterways, including liability of the insured for personal injury, illness, or death or for loss of or damage to the property of another person."). Therefore, within Chapter 7 alone, there are references to definitions for "vehicle insurance" (to insure against losses to "land vehicles," "aircraft," and "draft or riding animal[s]") and "marine protection and indemnity

15

insurance," as well as the undefined "automobile insurance" and "motor vehicle insurance." See generally *Abrohams v. Atlantic Mut. Ins. Agency*, 282 Ga. App. 176, 180 (1) (638 SE2d 330) (2006) (holding that excess policies "that provide motor vehicle or automobile liability coverage are subject to the requirements of OCGA § 33-7-11"), abrogated in part by statute as recognized in *Massey v. Allstate Ins. Co*., 341 Ga. App. 462, 466 (1) (a) (800 SE2d 629) (2017) (noting that umbrella policies were excluded by later amendment to OCGA § 33-7-11).

(iii) *Applicability of Other Definitions*. We acknowledge the Kelleys' reliance upon additional definitions of "motor vehicle" found throughout the Code.[10] See, e.g., OCGA § 33-63-3 (8) ("'Motor vehicle' means self-propelled or towed vehicles designed for personal or commercial use, including but not limited to automobiles, trucks, motorcycles, recreational vehicles, all-terrain vehicles, campers, boats, personal watercraft, and motorcycle, boat, camper, and personal watercraft trailers."). The statutes to which the Kelleys refer are not included in Chapter 7 of Title 33 and represent vastly different statutory schemes. In fact, Chapter 63, entitled "Guaranteed Asset Protection Waivers," makes clear that "[g]uaranteed asset protection waivers

---

[10] Because the term "motor vehicle" is defined in dictionaries, there is no justification to split the term and define "motor" and "vehicle" separately. Compare, e.g., *Willison v. Race*, 192 BR 949, 952-953 (Bankr. W. D. Mo. 1995).

16

. . . are *not* insurance and are *exempt from the insurance laws of this state.*" (Emphasis supplied.) OCGA § 33-63-2 (c); see also OCGA §§ 33-63-1, 33-63-3 ("The following terms are defined for purposes of [Chapter 63]. . . ."). Stated differently, these statutes are not in pari materia and need not be construed consistently with the provisions of OCGA § 33-7-11. See generally *Long*, 352 Ga. App. at 821 (3) (b) (3); *Mornay*, 331 Ga. App. at 115 (3).

Similarly, we are not persuaded by the Kelleys' reference to the United States Bankruptcy Code for broader definitions of "motor vehicle" which conflict with the plain and ordinary meaning of OCGA § 33-7-11 when reading it in its most natural and reasonable way, as Georgia law requires. See, e.g., *Willison v. Race*, 192 BR 949 (Bankr. W. D. Mo. 1995) (holding that a motorboat is a "motor vehicle" within the meaning of 11 USC § 523 (a) (9), "which excepts from discharge in bankruptcy the debtor's liabilities for death and personal injury caused by the debtor's unlawful operation of a motor vehicle while under the influence of drugs or alcohol"). Likewise, a Fifth Circuit decision which found "the plain meaning of the word 'vehicle' as used in [a decedent's] policies is unambiguous and broad enough to encompass a boat" as a matter of federal common law is unavailing, as it did not

17

address the specific term "motor vehicle," which we have already defined. See *Green v. Life Ins. Co. of N. America*, 754 F3d 324, 332 (B) (2) (5th Cir. 2014).

(iv) *Georgia Case Law*. Neither party has cited a Georgia case directly addressing the applicability of OCGA § 33-7-11 to motorized watercraft. Perhaps the most relevant case, however, is *Hinton v. Interstate Guar. Ins. Co.*, 267 Ga. 516 (480 SE2d 842) (1997). In *Hinton*, the plaintiff suffered injuries when she struck a farm tractor that was hauling a mobile home down a highway. The plaintiff's UM carrier moved for partial summary judgment, arguing that a farm tractor was not a "motor vehicle" for purposes of OCGA § 33-7-11. The trial court agreed and granted the carrier's motion, and this Court affirmed.[11]

Our Supreme Court reversed, rejecting the application of a narrow definition of "motor vehicle" in OCGA § 33-7-11 based upon the definition of "motor vehicle" in OCGA § 33-34-2. The Court highlighted the remedial purpose of the UM statute, noting that:

---

[11] In dissent, Judge Johnson argued that a restrictive definition of "motor vehicle" in OCGA § 33-7-11 would defeat the remedial purpose of the UM statute and lead to absurd results. See *Hinton v. Interstate Guar. Ins. Co.*, 220 Ga. App. 699, 703-705 (470 SE2d 292) (1996).

18

> The purpose of uninsured motorist legislation is to require some provision for first-party insurance coverage to facilitate indemnification for injuries to a person who is legally entitled to recover damages from an uninsured motorist, and thereby to protect innocent victims from the negligence of irresponsible drivers. Uninsured motorist statutes are remedial in nature and must be broadly construed to accomplish the legislative purpose.

(Citation and punctuation omitted.) *Hinton*, 267 Ga. at 517-518. The focus of the Court's distinction between the narrow definition of "motor vehicle" in OCGA § 33-34-2 and the remedial purpose of OCGA § 33-7-11 was that the former's narrow definition would exclude motorcycles, many of which "are designed to be driven primarily on the public highways and present a daily risk to other motorists" and which are "themselves required by OCGA § 40-6-11 to be covered by the same insurance required for 'motor vehicles' under OCGA § 33-34-1 et seq." Id. at 518. Therefore, relying again on the remedial purpose of OCGA § 33-7-11, the Court held that

> it is clear that the term "motor vehicle," for purposes of the uninsured motorist statute, must include *at least* two classes of motor vehicles: (1) Motor vehicles that are designed primarily for use on the public roads and are required by law to be covered by liability insurance; and (2) motor vehicles that are not designed primarily for use on the public

19

roads and are not required to have liability insurance, but which at the time of an accident are being operated on the public roads like a vehicle designed primarily for that purpose.

(Footnote omitted; emphasis supplied.) Id. As a result, the Court agreed that the definition of "motor vehicle" in OCGA § 33-7-11 "includes motor vehicles that, while designed primarily to operate off the public highways, are operating on the public highways at the time of an accident."[12] Id. at 520.

Notably, *Hinton* does not foreclose entirely the possibility that there may be circumstances other than a garden-variety collision on a public roadway that may trigger UM benefits under OCGA § 33-7-11.[13] However, there is no indication that

[12] In fact, the broader definition of "motor vehicle" we adopt herein would include farm tractors and motorcycles. See *Hinton*, 267 Ga. at 517-518; compare OCGA § 33-34-2 (2) ("'Motor vehicle' means a vehicle having more than three load-bearing wheels of a kind required to be registered under the laws of this state relating to motor vehicles designed primarily for operation upon the public streets, roads, and highways and driven by power other than muscular power. The term includes a trailer drawn by or attached to such a vehicle and also includes without limitation a low-speed vehicle.").

[13] Contrary to the Kelleys' argument, this Court has not concluded broadly that a motorized bathtub satisfied the definition of a "motor vehicle." In *Horne v. Govt. Employees Ins. Co.*, the victim died when a motorized bathtub, constructed for an annual race on the campus of Southern Technological Institute, left the designated course and struck the victim. 132 Ga. App. 230 (207 SE2d 636) (1974). The term "automobile" was contained in the medical payments provision of an insurance policy. Id. at 230 (1). Instead, we noted that such a machine "is not an 'automobile'

*Hinton*'s limited expansion to include a farm tractor or motorcycle,[14] which may be operated on public roadways and are required to be insured, involved in a collision on a public roadway would expand so far as to encompass motorized watercraft, which may not be operated on public roadways and are not required to be insured, see OCGA § 33-34-2 (2), involved in a collision on a public waterway. Therefore, we are not authorized to further expand the definition of "motor vehicle" in OCGA § 33-7-11 to include motorized watercraft or to hold that UM benefits are available under OCGA § 33-7-11 for collisions between motorized watercraft on public waterways.

What is left, then, is the prevailing dictionary definition of "motor vehicle," which does not include motorized watercraft and which has no substantive contradiction in the Code or our case law, and the remedial nature of OCGA § 33-7-11. These conflicting factors result in a close case. However, in view of our primary

as that term is used in the contract, although it may be a motor vehicle as defined by [a predecessor to OCGA § 40-1-1(33)]." Id. at 231 (1).

[14] As we have noted supra, the definition of "motor vehicle" is broad enough to include the farm tractor at issue in *Hinton*. Accordingly, Plaintiffs' argument that OCGA 33-7-11 applies to both "automobile" and "motor vehicle" liability policies and that "motor vehicle" is broader than "automobile" — and, therefore, includes watercraft — cannot prevail, because while our definition of "motor vehicle" is generally consistent with *Hinton* and broad enough to include farm tractors and motorcycles, there is nothing in our jurisprudence to indicate that it is so broad as to encompass watercraft.

21

obligation "to construe a statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage,"[15] see generally *Mornay*, 331 Ga. App. at 115 (3), we conclude that UM benefits pursuant to OCGA § 33-7-11 are not available for collisions between motorized watercraft on public waterways in Georgia.[16] It follows that the trial court correctly granted Cincinnati's motion for summary judgment and denied the Kelleys' competing motion.[17]

2. In view of our decision in Division 1 that OCGA § 33-7-11 does not include motorized watercraft in its definition of "uninsured motor vehicle," we need not

---

[15] Contrary to the Kelleys' argument, the term "automobile liability policy" is not rendered surplusage by our holding, as the term is separated from the term "motor vehicle liability policy" by the disjunctive "or," rather than the Kelleys' proposed conjunctive "and[.]" OCGA § 33-7-11 (a) (1).

[16] Because this result is mandated by the application of Georgia's rules of statutory construction, the General Assembly must determine whether a different, more inclusive definition of "motor vehicle" is necessary or warranted.

[17] Although the trial court suggested that any expansion of the definition of "motor vehicle" to include motorized watercraft would lead to absurd results, i.e., the application of OCGA § 33-7-11 to cover mid-air airplane collisions, our holding obviates the trial court's concern. Nor do we render an opinion on whether UM or UW benefits would be available under the express terms of an insurance contract, a question not present in this case. Rather, the *only* question we address is whether OCGA § 33-7-11 applies to a UM claim arising from a collision between two motorized watercraft on a public waterway.

consider the Kelleys' argument that their Auto and Watercraft policies are "motor vehicle liability policies." Likewise, the Kelleys' remaining arguments — that Cincinnati's alleged attempt to limit coverage in the policies is contrary to Georgia's insurance statutes and that Cincinnati's definition of "motor vehicle" violates Georgia public policy — necessarily depend upon an initial finding that OCGA § 33-7-11 applies to motorized watercraft. Having found that it does not, we do not consider these additional arguments.[18]

In sum, when the text of OCGA § 33-7-11 is read in its most natural and reasonable way, we conclude that the plain and ordinary meaning of "uninsured motor vehicle" is limited to land vehicles and does not include motorized watercraft. Accordingly, UM benefits pursuant to OCGA § 33-7-11 are not available for losses resulting from collisions between motorized watercraft on a public waterway. Therefore, we affirm the trial court's order granting Cincinnati's motion for summary judgment and denying the Kelleys' competing summary judgment motion, for now ending the quarrel.

*Judgment affirmed. Barnes, P. J., and Brown, J., concur.*

---

[18] Similarly, although Cincinnati raised an argument concerning the Kelleys' alleged failure to notify it of a loss as required by the policies, the trial court did not rule on that issue and we do not consider it here.